**This order is SIGNED.**

**Dated: February 14, 2025**



KEVIN R. ANDERSON
U.S. Bankruptcy Judge

*slo*

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF UTAH

| | |
|---|---|
| In re: | Bankruptcy Case No. 23-23305 |
| MATHEW GENE FHUERE, | Chapter 7 |
| Debtor. | |
| UNITED STATES TRUSTEE and THOMAS DENSLEY, | Adversary Proceeding Nos. 24-02013 & 24-02014 |
| Plaintiffs, | Hon. Kevin R. Anderson |
| vs. | |
| MATHEW GENE FHUERE, | |
| Defendant. | |

### MEMORANDUM DECISION ON MOTIONS FOR SUMMARY JUDGMENT

One of the *quid pro quos* for a discharge in bankruptcy is the full disclosure of a debtor's financial condition and history. So when a debtor, without appropriate justification, fails to keep or preserve adequate business records so as to make it impossible for parties in interest to ascertain the debtor's financial status, the Bankruptcy Code mandates a denial of discharge.

In this case, for 35 years, the Debtor operated businesses that restored and/or customized collectible automobiles. However, other than bank statements, the Debtor failed to keep and

preserve business records, and these bank statements are legally insufficient for parties in interest to understand and trace the substantial flow of funds in and out of the Debtor's businesses. As a result, and because the Debtor is without appropriate justification for this failure, the Court must deny the Debtor's discharge under 11 U.S.C. § § 727(a)(3).[1]

## I.   JURISDICTION AND VENUE

The Court's jurisdiction over these adversary proceedings is properly invoked under 28 U.S.C. § 1334(b) and § 157(a) and (b)(1) and (2). The Plaintiffs' complaints include causes of action objecting to the Debtor's discharge under 11 U.S.C. § 727, making this a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (J). Venue is appropriately laid in this District under 28 U.S.C. § 1409.

## II.   PROCEDURAL BACKGROUND

The U.S. Trustee and Thomas Densley ("Plaintiffs") filed adversary complaints against the Debtor seeking, *inter alia*, to deny his discharge under § 727. The Debtor, proceeding *pro se*, filed answers to the Plaintiffs' complaints. Both Plaintiffs then sought partial summary judgment against the Debtor under § 727(a)(3) based on his alleged failure to keep and preserve adequate business records. On August 13, 2024, the Court conducted a hearing on the motions for summary judgment and heard arguments from the Plaintiffs and the Debtor. The Court took the matter under advisement and is now prepared to rule.[2]

---

[1] All subsequent references to United States Code sections are to Title 11 unless otherwise specified.

[2] This Memorandum Decision constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a), made applicable in adversary proceedings by Fed. R. Bankr. P. 7052. Any of the findings of fact herein are deemed, to the extent appropriate, to be conclusions of law, and any conclusions of law are similarly deemed to be findings of fact, and they shall be equally binding as both.

### III.   UNDISPUTED FACTS

#### A.  The Debtor's Bankruptcy Filings.

1.      The Debtor received Chapter 13 discharges in two prior bankruptcy cases: (1) on June 17, 2009, in Case No. 05-40205 in the U.S. Bankruptcy Court for the District of Nebraska, and (2) on November 7, 2013, in Case No. 10-27285 in the U.S. Bankruptcy Court for the District of Utah.

2.      The Debtor filed this Chapter 7 case on August 4, 2023.

3.      The petition filed on that date identified D&M Kustoms and Klassics LLC as a sole proprietorship owned by the Debtor.[3]

4.      On September 15, 2023, the Debtor filed his bankruptcy statement of financial affairs and schedules ("Statement of Affairs")[4] and a mailing list containing only nine creditors. His Statement of Affairs identified his businesses as D&M Kustoms and Klassics LLC, which provided restoration and/or customization services on collectible cars.

5.      On October 10, 2023, during the first meeting of creditors, ("341 Meeting"), the Debtor acknowledged that he had failed to notify many of his creditors of his bankruptcy filing. The Chapter 7 Trustee adjourned the meeting to allow for notice to these additional creditors.

6.       On November 1, 2023, the Debtor filed an amended bankruptcy petition, schedules, and Statement of Affairs, and he added 95 additional parties to his list of creditors. The Debtor identified D&M Kustoms and Klassics and Mat's Rods and Restorations as sole proprietorships he owned.[5]

---

[3] ECF No. 1 in Case No. 23-23305, at 4.
[4] ECF No. 13 in Case No. 23-23305.
[5] ECF No. 34 in Case No. 23-23305, at 8.

7.     Twenty-six of the Debtor's customers have filed proofs of claim totaling more than $1 million. These claims are primarily based on money paid for work not completed by the Debtor's businesses (see the following summary):

| Claim No. | Creditor | Basis of Claim | Amount of Claim |
|---|---|---|---|
| 7 | Russell | Work paid for, not performed | $ 10,500.00 |
| 8 | Robinson | Deposit to have restoration work performed that was never done. | 8,700.00 |
| 9 | Postlethwait | Money owed under restoration contract | 12,000.00 |
| 10 | Butterfield | Restoration of 79 Trans Am not complete | 15,000.00 |
| 11 | Revel | Money paid for work not completed | 16,000.00 |
| 13 | Pepper | Incomplete work for large deposit on agreement to restore vehicle | 47,737.00 |
| 16 | Nuttal | Money gave [sic] to Mathew Fhuere to restore a 1968 Camero | 25,000.00 |
| 17 | Thomas | Deposit made; services not completed | 33,000.00 |
| 18 | Elsbury | Down payment for work to be performed | 15,000.00 |
| 19 | Bunzenhauser | Money paid for restoration services; services not done | 17,000.00 |
| 20 | Larry Weist | 1965 Ford Mustang missing or broken parts | 1,299.09 |
| 21 | Andrea Weist | Money paid for work not completed | 27,133.60 |
| 22 | Hill | Down payment on Auto body & paint Job. Missing Car parts. | 15,813.28 |
| 23 | Gyll | Paid $40,000; work not done; misrepresentations by Mat | 40,000.00 |
| 24 | Jeffries | Downpayments for services not performed; parts stolen or destroyed | 23,000.00 |
| 25 | Pacheco | Refund due for failure to perform/deliver as agreed per contract | 5,000.00 |
| 27 | Barclay | Unfinished work on 1968 Camaro that had already been paid for | 6,500.00 |
| 28 | Cartwright | Down payment of 5,000.00 for service and materials. Nothing done | 5,000.00 |
| 31 | Nick San Juan | Money paid to restore a Jaguar 1972 | 12,500.00 |
| 32 | Zeberlin | Money paid in deposits and promised work not done | 11,586.00 |
| 33 | Densley | Damages for breach of contract, fraud, and related causes of action | 175,000.00 |
| 39 | Dotson | Dotson paid debtor $107,600 for snow coach restoration, not done. | 107,600.00 |
| 40 | Gleason | Was hired to complete car; Paid $4,500; No work was done | 4,500.00 |
| 41 | Mears | Payments made but the work wasn't completed. | 13,000.00 |
| 42 | Miner | Paid money for restoration services, work not done | 38,869.87 |
| 43 | Hoskins | Payment for Goods and Services Sold to Creditor But Not Received | 500,000.00 |
| Total: | | | $1,186,738.84 |

**B.  The Debtor's Car Customization and Restoration Businesses.**

8.      The Debtor has over 35 years of experience in automotive customization and restoration, which he applies to rebuilding and repairing classic cars, often with the purpose to prepare the vehicles for use in car shows. In providing these services, he employed a crew of employees.[6]

9.      Previously, the Debtor operated his business using the *dba* "D and M Kustoms and Klassics" ("D&M Klassics"), changing the name in 2018 to *dba* "Mat's Rods and Restorations" ("Mat's Rods").

10.     At his 341 Meeting, the Debtor explained that D&M Klassics and Mat's Rods are effectively the same business entity with the same EIN, and that all customers, contracts, business practices, and bank accounts are the same.

11.     The Debtor subsequently changed Mat's Rods to an LLC in 2022 ("Mat's Rods LLC"). The Debtor was a member of Mat's Rods LLC.[7]

12.     The Debtor never caused a tax return to be prepared or filed for Mat's Rods LLC.[8]

**C.  Document Requests and Productions.**

13.     At the beginning of the Debtor's bankruptcy case, the U.S. Trustee served on the Debtor a subpoena duces tecum requesting tax returns, profit and loss statements, balance sheets, and bank statements.[9] The Debtor responded to the subpoena with bank statements and information about his accountant, but he indicated there were no profit and loss statements or balance sheets, and he did not produce any business records other than the bank statements.

---

[6] ECF No. 5 in Adv. Pro. No. 24-02013, ¶ 26 (hereinafter "Answer, ¶ __").
[7] *Id.* ¶ 33.
[8] *Id.* ¶ 45.
[9] ECF No. 56 in Case No. 23-23305.

14.　　The U.S. Trustee also conducted a Bankruptcy Rule 2004 examination of the Debtor on January 9, 2024 (the "2004 Exam"). The attorney for plaintiff Thomas Densley also attended and asked questions.[10]

15.　　At the 2004 Exam, the Debtor was asked about bank transactions involving millions of dollars. The Debtor testified that he pulled money out of his bank accounts in the form of cashier's checks, that he kept the cashier's checks in an office drawer at his business, and that he deposited cashier's checks back into his bank accounts as needed.[11]

16.　　The Debtor also testified that there are no records regarding his use of the cashier's checks other than the bank statements.[12]

17.　　In addressing additional questions about the large sums of money taken out of his bank accounts, the Debtor could not recall specifics as to what happened with the money, and he admitted that the only documents related to such matters were the bank records that he had provided to the Trustee. For example, the Debtor testified as follows:

> [Mr. Shields]: [W]hat happened to the money that went in and out of those bank accounts? Where is it? Where did it go? . . .
>
> [The Debtor]: Operating expenses. You know, parts, supplies. Just keeping the business --  payroll.
>
> [Mr. Shields]: There's [sic] no records to show that, is [sic] there?
>
> [The Debtor]: Yeah, they [sic] are bank statements.
>
> [Mr. Shields]: Other than the bank statements?
>
> [The Debtor]: No.[13]

---

[10] ECF No. 23-9.

[11] ECF No. 23-9, Transcript of Debtor's 2004 Exam, at 56:6-19; 63:10-20; 93:15-18

[12] *Id*. at 93:23-94:1.

[13] *Id*. at 118:15-119:2

18.     Finally, the U.S. Trustee wanted an accounting of the Debtor's business but then asked, "you don't really know and there weren't business records to explain this?" And the Debtor responded, "Right."[14]

**D.  The Debtor's Business Records.**

19.     The Debtor last filed state and federal tax returns in 2019. These returns showed $939,839 in gross income from Mat's Rods.[15] The Debtor has not filed tax returns for 2022-2023.[16]

20.     The Debtor's bankruptcy papers disclose that Reed Nielsen CPA was the accountant or bookkeeper for his business from 2014 to 2022. At his 341 Meeting, the Debtor testified that Reed Nielsen stopped working for his business because his CPA company was "going to larger accounts and were not going to be handling small accounts."[17]

21.     At his 2004 Exam, the Debtor testified that he does not know how to use bookkeeping software so he "just use[s] paper."[18] Further, the Debtor does not keep track of transactions for his business as a whole; instead, "each client will have a file, and I will use their file and their accounting separately and try to update it through that."[19] However, the Debtor never produced these client files.

22.     The Debtor's Schedule A/B lists the following bank accounts:

    a.  Wells Fargo 4047 – Mat's Rods

    b.  Wells Fargo 6366 – Mat's Rods

    c.  Alpine Credit Union 9912 – Mat's Rods

---

[14] *Id*. at 74:5-8.
[15] Answer, ¶ 41.
[16] Answer, ¶ 40.
[17] Answer, ¶ 42.
[18] Answer, ¶ 46; ECF No. 23-9, Transcript of Debtor's 2004 Exam, at 15:13.
[19] Answer, ¶ 47; ECF No. 23-9, Transcript of Debtor's 2004 Exam, at 15:20-22.

    d. Alpine Credit Union 4246 – Mathew and Linda Fhuere

    e. Zions Bank 3815 – Mat's Rods

    f. America First Credit Union – Mat's Rods[20]

23. The Debtor and his spouse, Linda Fhuere, also have a Wells Fargo account ending in 3265; however, the Debtor did not list this account on Schedule A/B.[21]

24. While the Debtor has multiple bank accounts, his bills were not consistently paid from any one account. For example, at the 2004 Exam, the Debtor testified that he sometimes paid his landlord by check from whichever account had sufficient funds, and he sometimes paid the landlord in cash.[22] The Debtor further testified that he also pays the rent for his personal residence out of these bank accounts.[23] The Debtor admitted to this statement in his Answer but noted that "deposits were made from other sources as well."[24]

25. The Debtor frequently transferred money among accounts for differing amounts and at differing times. Further, the Debtor would frequently take money out of the accounts at the end of the month and then put it back at the beginning of the next month. At his 2004 Exam, the Debtor explained that he did this because he does not trust banks. The Debtor admitted to this in his Answer and clarified that he "has many reasons, including banks['] mistakes and fraudulent withdrawals that took time and disputes to receive and refund, [Debtor] wanted more control and [to] safeguard funds."[25]

---

[20] Answer, ¶ 38.

[21] Answer, ¶ 39.

[22] Answer, ¶ 51 and ECF No. 23-9, Transcript of Debtor's 2004 Exam, at 75:20-23.

[23] ECF No. 23-9, Transcript of Debtor's 2004 Exam, at 14:1-25.

[24] Answer, ¶ 52.

[25] Answer, ¶ 53.

26.     The U.S. Trustee analyzed the Debtor's bank statements for June, July and August

2022.[26] The following chart shows the opening and closing balance of each account, along with

the dollar amount of deposits and withdrawals.[27]

| Date | Financial Account | Opening Balance | Deposits | Withdrawals | Ending Balance |
|---|---|---|---|---|---|
| 2022 – June | Wells Fargo 4047 | $2,301 | $175,099 | $173,048 | $4,352 |
| 2022 – July | Wells Fargo 4047 | $4,352 | $125,118 | $127,122 | $2,348 |
| 2022 - Aug | Wells Fargo 4047 | $2,348 | $75,834 | $79,748 | $1,565 |
| 2022 – June | Wells Fargo 6366 | $943 | $56,639 | $36,843 | $20,738 |
| 2022 – July | Wells Fargo 6366 | $20,738 | $21,400 | $41,999 | $138 |
| 2022 - Aug | Wells Fargo 6366 | $138 | $50,857 | $50,886 | $109 |
| 2022 – June | Alpine CU 9912 | $1,016 | $122,831 | $97,126 | $26,721 |
| 2022 – July | Alpine CU 9912 | $26,721 | $81,528 | $104,741 | $3,507 |
| 2022 - Aug | Alpine CU 9912 | $3,507 | $33,475 | $33,363 | $3,618 |
| 2022 – June | Zions 3815 | $55 | 0 | $3 | $52 |
| 2022 – July | Zions 3815 | $52 | 0 | $3 | $49 |
| 2022 - Aug | Zions 3815 | $49 | 0 | $3 | $46 |
| 2022 – June | AFCU 0575 | $189 | $1,750 | $1,806 | $132 |
| 2022 – July | AFCU 0575 | $132 | 0 | $115 | $17 |
| 2022 - Aug | AFCU 0575 | $17 | $35,644 | $32,149 | $3,512 |

27.     An analysis of the bank statements for June, July and August 2023,[28] leading up

to the bankruptcy filing, shows similar patterns in deposits and withdrawals:[29]

| Date | Financial Account | Opening Balance | Deposits | Withdrawals | Ending Balance |
|---|---|---|---|---|---|
| 2023 – June | Wells Fargo 4047 | -$50 | $110 | $155 | -$96 |
| 2023 – July | Wells Fargo 4047 | -$96 | $2,000 | $1,726 | $176 |
| 2023 - Aug | Wells Fargo 4047 | $176 | $52 | $340 | -$111 |
| 2023 – June | Wells Fargo 6366 | $0.42 | $3,800 | $3,729 | $70 |
| 2023 – July | Wells Fargo 6366 | $70 | $10,800 | $10,677 | $193 |

---

[26] *See* ECF Nos. 23-13 through 23-17.

[27] Answer, ¶ 55.

[28] *See* ECF Nos. 23-18 through 23-22.

[29] Answer, ¶ 57.

| 2023 - Aug | Wells Fargo 6366 | $193 | $15 | $103 | $105 |
| 2023 – June | Alpine CU 89912 | -$11,754 | 0 | 0 | -$11,754 |
| 2023 – July | Alpine CU 89912 | -$11,754 | $11,954 | $60 | $140 |
| 2023 - Aug | Alpine CU 89912 | $140 | 0 | 0 | $140 |
| 2023 – June | Zions 3815 | $250 | $83,000 | $82,822 | $428 |
| 2023 – July | Zions 3815 | $428 | $20,600 | $20,284 | $744 |
| 2023 - Aug | Zions 3815 | $744 | $36,198 | $33,423 | $3,519 |
| 2023 – June | AFCU 0575 | $489 | $26,104 | $27,477 | -$884 |
| 2023 – July | AFCU 0575 | -$884 | $5,000 | $3,947 | $168 |
| 2023 - Aug | AFCU 0575 | $168 | $11,784 | $11,430 | $520 |

28.     The total amounts deposited and withdrawn from all of the Debtor's bank

accounts is summarized as follows:

| | | | | Amount Deposited | Amount Withdrawn/ Checks Cleared |
|---|---|---|---|---|---|
| 1 | Wells Fargo | Business Checking | Acct No. XXX6366 | $1,092,051.34 | $1,093,154.86 |
| 2 | Wells Fargo | Everyday Checking | Acct No. XXX3265 | $109,556.89 | $110,286.06 |
| 3 | Wells Fargo | Business Checking | Acct No. XXX4047 | $1,487,030.78 | $1,493,267.29 |
| 4 | Alpine CU | Checking | Acct No. XXX4246 | $58,260.90 | $58,883.98 |
| 5 | Alpine CU | Savings | Acct No. XXX4246 | $76,694.73 | $76,776.29 |
| 6 | Alpine CU | Checking | Acct No. XXX9912 | $797,587.60 | $796,335.24 |
| 7 | Alpine CU | Savings | Acct No. XXX9912 | $49,535.98 | $52,406.00 |
| 8 | America First CU | Checking | Acct No. XXX0575 | $594,100.52 | $593,007.32 |
| 9 | America First CU | Savings | Acct No. XXX0575 | $74,200.33 | $63,285.13 |
| 10 | Zions Bank | Checking | Acct No. XXX3815 | $145,398.93 | $141,940.58 |
| **Totals:** | | | | **$4,484,418.00** | **$4,479,342.75** |

29.     The Debtor collected sizable deposits from customers. The bank statements and proofs of claim show that individual customer deposits ranged from a few thousands of dollars up to more than $100,000.[30]

30.     According to information contained on the bank statements, the Debtor, directly or through his business, took out short-term loans from certain lenders, including Kalamata Capital, Delta Bridge Funding, EBF Holdings, Kapitus, Headway Capital, MR Advance, and Front Capital ("Short-Term Lenders").[31]

31.     The Debtor does not know the total amount he borrowed collectively or individually from the Short-Term Lenders,[32] he does not know the interest rates on these loans,[33] and he does not know the total amount he paid back to them.[34]

32.     At the 2004 Exam, the Debtor testified that he filled out loan applications online in response to being contacted from a lender willing to offer funds. He believes some of them were paid off before his bankruptcy filing while others were not. The Debtor explained that the Short-Term Lenders may or may not be listed as creditors in his bankruptcy case because some of them may use names of their parent companies or subsidiaries. The Debtor cannot identify which Short-Term Lenders may be identified differently on his Schedules when compared to the names of lenders who were withdrawing payments from his bank accounts.[35]

33.     The Debtor testified that the only written records of the transactions with the Short-Term Lenders were the bank statements.[36] The Debtor denied this in his Answer as

---

[30] Answer, ¶ 62.

[31] Answer, ¶ 83.

[32] Answer, ¶ 85.

[33] Answer, ¶ 87.

[34] Answer, ¶ 86.

[35] Answer, ¶ 88.

[36] ECF No. 23-9, Transcript of Debtor's 2004 Exam, at 109:6-10.

"factually inaccurate,"[37] but he did not explain why this allegation was factually inaccurate, and he did not produce any records other than his bank statements.

34.     In summary, the only business records produced by the Debtor in his bankruptcy case are the bank account statements and the 2019 tax returns.[38]

## IV.   <u>ANALYSIS</u>

### A. **Summary Judgment Standard.**

Under Fed. R. Civ. P. 56(a), as applicable to this adversary proceedings under Bankruptcy Rule 7056, the Court is required to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[39] Substantive law determines which facts are material and which are not. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[40] Whether a dispute is "genuine" turns on whether "the evidence is such that a reasonable [fact finder] could return a verdict for the nonmoving party."[41] In sum, the Court's function at the summary judgment stage is to "determine whether there is a genuine issue for trial."[42]

The moving party bears the burden to show that it is entitled to summary judgment,[43] including the burden to properly support its summary judgment motion as required by Rule 56(c).[44] If the moving party meets its initial burden, "the burden shifts to the nonmoving party to

---

[37] Answer, ¶ 89.

[38] Answer, ¶ 48.

[39] Fed. R. Civ. P. 56(a).

[40] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[41] *Id*.

[42] *Id.* at 249.

[43] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[44] *See Murray v. City of Tahlequah, Okla.*, 312 F.3d 1196, 1200 (10th Cir. 2002).

demonstrate a genuine issue for trial on a material matter."[45] The nonmoving party may not rely solely on allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial."[46] The nonmoving party also "must do more than simply show that there is some metaphysical doubt as to the material facts."[47] The burdens imposed on litigants at this stage of the proceedings underscore that "summary judgment is 'not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events.'"[48] When considering a motion for summary judgment, the Court views the record and draws all reasonable inferences therefrom in the light most favorable to the nonmoving party,[49] but the Court does not weigh the evidence or make credibility determinations.[50]

### B.  The Record Keeping Duties of a Chapter 7 Debtor.

Plaintiffs seek a denial of the Debtor's discharge under § 727(a)(3), which states in relevant part:

> The court shall grant the debtor a discharge, unless . . . (3) **the debtor has . . . failed to keep or preserve any recorded information**, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case . . . .[51]

---

[45] *Concrete Works of Colo., Inc. v. City & County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994).

[46] *Celotex*, 477 U.S. at 324.

[47] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[48] *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005)).

[49] *E.g.*, *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010) (citation omitted).

[50] *Nat'l Am. Ins. Co. v. Am. Re-Insurance Co.*, 358 F.3d 736, 742-43 (10th Cir. 2004) (citing *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 533 (10th Cir. 1994)).

[51] § 727(a)(3) (emphasis added).

This section "places an affirmative duty on the debtor to create books and records accurately documenting his business affairs."[52] It further "ensures that trustees and creditors will receive sufficient information to enable them to trace the debtor's financial history; to ascertain the debtor's financial condition; and to reconstruct the debtor's financial transactions."[53] "In other words, 'adequate record-keeping is a predicate for a debtor's discharge.'"[54]

As used in § 727(a)(3), the terms "keep" and "preserve" impose different duties on a Chapter 7 debtor. To "keep" a record means that the debtor is recording business information in a generally contemporaneous, comprehensible, and reasonable manner to facilitate a determination of the business's financial status and the preparation of required reports and tax returns. In other words, the debtor has an affirmative duty to "to create books and records accurately documenting his business affairs."[55] To "preserve" means the debtor  permanently recorded and stored business records in a manner that makes them reasonably recoverable and understandable by a trustee or other party in interest such that they can ascertain the debtor's present financial condition along with its financial history and transactions going back a reasonable amount of time.[56] Consequently, "if corporate records are necessary to determine the debtor's financial condition, and the debtor has not kept or preserved such records, the debtor's discharge should be denied pursuant to § 727(a)(3)."[57]

---

[52] *Hunt v. Steffensen (In re Steffensen)*, 534 B.R. 180, 199 (Bankr. D. Utah 2015) *aff'd* 567 B.R. 188 (D. Utah 2016), (quoting *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 969 (7th Cir. 1999)).

[53] *Id*. at 196.

[54] *Bavely v. Daniels (In re Daniels)*, 641 B.R. 165, 183 (Bankr. S.D. Ohio 2022) (quoting *Agai v. Antoniou (In re Antoniou)*, 527 B.R. 71, 78 (Bankr. E.D.N.Y. 2015)).

[55] *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 969 (7th Cir. 1999) (citing *In re Juzwiak*, 89 F.3d 424, 429 (7th Cir. 1996) ("The debtor has the duty to maintain and retain comprehensible records.")).

[56] *Lee v. Peeples (In re Peeples)*, 779 F. App'x 561, 566 (10th Cir. 2019) (unpublished) ("Section 727(a)(3) is intended to allow creditors to 'reasonably . . . ascertain [the debtor's] present financial condition and to follow his business transactions for a reasonable period in the past.'") (alteration in original; citation omitted).

[57] *Id*.

Section 727(a)(3) does not require that a debtor keep and preserve particular types or categories of records, nor does it require that the records be perfect or even complete.[58] For some debtors, "[b]ank records and credit card statements 'may be sufficient to enable creditors to trace financial transactions and evaluate the debtor's financial condition.'"[59] But because "[c]ourts typically place a higher burden of recordkeeping on debtors who operate businesses,"[60] bank records alone will not satisfy § 727(a)(3) where the debtor "ran a business enterprise engaged in a steady stream of large scale transactions involving substantial sums of money."[61] Instead, a debtor who owns or operates a closely-held business or whose personal finances are intertwined with those of the business must produce corporate records to satisfy § 727(a)(3).[62] Those records must be maintained "in a manner consistent with what is normally expected of businesses of the same complexity."[63]

The analysis under § 727(a)(3) operates under a burden-shifting framework. "To state a prima facie case under § 727(a)(3), a [plaintiff] must show by a preponderance of the evidence that the debtor 'failed to maintain and preserve adequate records and that the failure made it *impossible* to ascertain his or her financial condition and *material* business transactions.'"[64] If the plaintiff carries this burden, "the burden shifts to the debtor to justify his or her failure to

---

[58] *Steffensen*, 534 B.R. at 197 (collecting cases); *see also Daniels*, 641 B.R. at 184 (collecting cases).

[59] *Peeples*, 779 F. App'x at 566 (quoting *Juzwiak*, 89 F.3d at 428).

[60] *Daniels*, 641 B.R. at 184 (collecting cases).

[61] *Peeples*, 779 F. App'x at 566 (quoting *Juzwiak*, 89 F.3d at 428).

[62] *Daniels*, 641 B.R. 184-85 (collecting cases); *see also Steffensen*, 567 B.R. at 199 ("[A] lack of business records relating to a company substantially intertwined with a debtor may provide the basis for the denial of a debtor's individual discharge under § 727(a)(3)." (quoting *U.S. Trustee v. Kandel (In re Kandel)*, Adv. No. 12-6003, 2015 WL 1207014, at *8 (Bankr. N.D. Ohio Mar. 13, 2015))).

[63] *Steffensen*, 534 B.R. at 198 (quoting *Jacobowitz v. Cadle Co. (In re Jacobowitz)*, 309 B.R. 429, 436 (Bankr. S.D.N.Y. 2004)); *see also State Bank of India v. Sethi (In re Sethi)*, 250 B.R. 831, 839 (Bankr. E.D.N.Y. 2000) ("[T]he more complex the debtor's financial situation, the more numerous and detailed the debtor's financial records should be.").

[64] *Steffensen*, 567 B.R. at 199 (citing *Gullickson v. Brown (In re Brown)*, 108 F.3d 1290, 1295 (10th Cir. 1997)).

maintain the records."[65] A debtor's intent is not an element of a § 727(a)(3) claim,[66] but if the debtor can prove that the failure to keep or preserve business records was "justified under all of the circumstances of the case," then a discharge can still be granted.[67] The plaintiff has the ultimate burden to prove its § 727 claim by a preponderance of the evidence.[68]

### C. The Debtor Failed to Keep and Preserve Adequate Records.

In this case, the Debtor has over 35 years of experience in automotive customization and restoration, and he employed a crew of employees to assist in this enterprise.[69] The Debtor created, owned, and operated various legal entities through which he conducted his restoration business.[70] Many of the restoration projects spanned more than a year.[71] The Debtor's businesses generated significant income, with his 2019 tax return—the last one filed—showing gross income in excess of $939,000. The proofs of claim filed in this case and the bank statements show that individual customer deposits ranged from a few thousands of dollars to more than $100,000[72] and totaled over $1.1 million. The Debtor also regularly transferred large sums of money among his various bank accounts in ways that made it impossible to ascertain the income, expenses, and transactions of his businesses.[73] Specifically, the Debtor's bank statements show over $4 million flowing in, out, and among his bank accounts on an "as needed" basis, with

---

[65] *Peeples*, 779 F. App'x at 566 (quoting *Martinez v. Sears (In re Sears)*, 565 B.R. 184, 189 (10th Cir. BAP 2017)).

[66] *Bailey v. Fry (In re Fry)*, Adv. Pro. No. 11-02374, 2012 Bankr. LEXIS at *12, 2012 WL 3782555 at *5 (Bankr. D. Utah Aug. 31, 2012) (citations omitted).

[67] § 727(a)(3).

[68] *Peeples*, 779 F. App'x at 566 (citing *Sears*, 565 B.R. at 189).

[69] Answer, ¶ 26.

[70] Answer, ¶ 28, 31, 33.

[71] *See, e.g.,* Proof of Claim No. 13 (contract signed 9/28/2020, with a completion estimate of 6-8 months yet project remained unfinished in 2023) and Proof of Claim No. 17 (contract signed 9/26/2018, no estimated completion date, but project remained unfinished in 2023).

[72] *Id.*; *see also* Answer, ¶ 62.

[73] Answer, ¶ 55, 57; *see also* ECF No. 23-12, Declaration of James Gee.

many of the transactions involving the withdrawal of cash. Indeed, the Debtor stated that he preferred to deal with cash to negotiate for lower prices and because he did not trust banks.[74]

The Debtor's ownership of D&M Klassics/Mat's Rods and membership interest in Mat's Rods LLC, combined with the volume of business conducted by those entities, demonstrate that the Debtor "ran a business enterprise engaged in a steady stream of large-scale transactions involving substantial sums of money."[75] Accordingly, the Debtor must produce records from those entities to satisfy his duty under § 727(a)(3). In particular, the records must be more than mere bank account statements, and they must be records of the kind maintained by similar businesses of the same complexity.

The Court does not have occasion to determine precisely what records are required from businesses such as the Debtor's because the records the Debtor has produced are insufficient to satisfy § 727(a)(3) as a matter of law. The Court notes, however, that completed and filed tax returns are typically among the foundational records required. They "provide a trustee and creditors significant insight into a debtor's financial condition"[76] and "are quintessential documents 'from which the debtor's financial condition or business transactions might be ascertained,' in the words of subsection (3)."[77] "A debtor's failure to timely file tax returns—especially for several years in a row—is a blatant example of a failure to maintain adequate records."[78]

---

[74] *Id.* ¶ 53.

[75] *Peeples*, 779 F. App'x at 566 (quoting *Juzwiak*, 89 F.3d at 428).

[76] *Daniels*, 641 B.R. at 185 (citations omitted).

[77] *Stillwater Liquidating LLC v. Gray (In re Gray)*, Adv. Pro. No. 14-02235 (SMB), 2016 Bankr. LEXIS 804, at *12-13, 2016 WL 1039559, at *5 (Bankr. S.D.N.Y. Mar. 15, 2016) (quoting *Nisselson v. Wolfson (In re Wolfson)*, 152 B.R. 830, 833 (S.D.N.Y. 1993)).

[78] *Jou v. Adalian (In re Adalian)*, 500 B.R. 402, 407 (Bankr. M.D. Pa. 2013) (citing *Pher. Partners v. Womble (In re Womble)*, 289 B.R. 836, 858 (Bankr. N.D. Tex. 2003), *aff'd* 299 B.R. 810 (N.D. Tex. 2003), *aff'd* 108 F. App'x 993

Here, the Debtor has not filed tax returns for multiple consecutive years leading up to the petition date. He last filed a tax return in 2019,[79] and he has not filed any tax return for Mat's Rods LLC. The only documents he has produced regarding his financial affairs are that 2019 tax return and two years of bank account statements.[80] However, these documents are inadequate to ascertain the debtor's financial condition or business transactions.[81] As noted in *In re Steffensen*, "[a]lthough 'the statute does not require absolute completeness in making or keeping records,' it is equally clear from the case law that a debtor may produce all the records he has and still not meet the test imposed by § 727(a)(3)."[82]

Based on this and the length and scope of the Debtor's business activities, the Court finds for purposes of § 727(a)(3) that the Plaintiffs have carried their initial burden to show that the Debtor failed to keep and preserve adequate business records.

### D.  From the Produced Records, It Is Impossible to Ascertain the Debtor's Business Transactions.

When determining whether a debtor's failure to maintain records makes it impossible to ascertain the debtor's business transactions, a court may consider (1) the nature of the debtor's enterprise; (2) the sophistication of the debtor; and (3) the quality of the records provided.[83] However, the burden of reconstructing the debtor's financial history should not fall on either creditors or the trustee.[84] Furthermore, in the context of § 727(a)(3):

---

(5th Cir. 2004)); *see also Randolph v. Joseph (In re Joseph)*, 665 B.R. 783, 791-92 (Bankr. E.D. Ky. 2024) (collecting cases).

[79] Answer, ¶ 40.

[80] Answer at ¶ 48.

[81] *See In re Juzwiak*, 89 F.3d 424, 428 (7th Cir. 1996) ("Many courts faced with checking account records, canceled checks, deposit slips, bank statements, and tax returns as the sole documentation of a debtor's financial history and condition have determined that such records are inadequate under § 727(a)(3).").

[82] *Steffensen,* 534 B.R. at 197 (citations omitted).

[83] *Fry*, 2012 WL 3782555, at *5 (citing *Brown*, 108 F.3d at 1295).

[84] *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 969-70 (7th Cir. 1999) (holding that a chapter 7 trustee does not have an obligation to reconstruct a debtor's financial condition by combing through boxes of records); *see also Matter of*

18

"impossible" should not be read to require a plaintiff to exhaust all theoretical means to determine the debtor's financial condition. "[A] party objecting to discharge need show only that it cannot ascertain the debtor's financial condition and recent business transactions *from the records provided*. It is not necessary to show that there is no conceivable way to ascertain the financial condition of the debtor."[85]

As noted above, the Debtor performed vehicle restoration services for 35 years. His businesses generated around a million dollars a year and attracted many clients. The Debtor had employees to assist him, and he retained an accountant from 2014 to 2022 to prepare reports and taxes. Thus, the Debtor had the business experience to understand the need for and the importance of keeping and preserving adequate business records.

There are 26 claims in this case totaling over $1.1 million that were filed by customers asserting that the Debtor failed to complete customization and restoration projects. Further, the Debtor's bank statements show that over two years, he made over $4.4 million in transfers among his accounts. These facts establish that the Debtor had significant business activities and transactions. Yet, all that has been produced are basic bank account statements that contain no information as to purposes behind the transfers and little understandable information as to the recipient, other than transfers to other bank accounts. Thus, there is much more to the Debtor's financial story that is relevant to this bankruptcy case than can be ascertained from the Debtor's bank statements.[86]As stated by U.S. Trustee's Bankruptcy Auditor, James Gee:

> In my review of the debtor's financial records and filings and testimony in this case, I cannot ascertain which cash withdrawals were used to pay business

---

*Juzwiak*, 89 F.3d at 429 ("Creditors are not required to sift through documents and attempt to reconstruct the flow of the debtor's assets.").

[85] *Steffensen*, 534 B.R. at 197 (quoting *Jacobowitz v. Cadle Co. (In re Jacobowitz)*, 309 B.R. 429, 438 (S.D.N.Y. 2004) emphasis in original).

[86] *See Steffensen*, 534 B.R. at 196 (The required disclosures "removes the risk to creditors of the withholding or concealment of assets by the bankrupt under the cover of a chaotic or incomplete set of books or records.") (citation omitted).

expenses, which cash withdrawals were re-deposited into a financial account at a later date, which cash withdrawals from business accounts may have been used for personal expenditures, and which cash withdrawals may simply have been retained in the Debtor's possession as cash (or as still-yet-uncashed cashier's checks) and/or stashed elsewhere.

Based on the undisputed facts, the Court finds that for purposes of § 727(a)(3), it is impossible for a party in interest to ascertain the Debtor's true financial condition and his material business transactions.

### E. The Debtor's Failure to Keep and Preserve Business Records Was Not Justified Under All of the Circumstances of the Case.

Even if debtors do not keep and preserve adequate books and records, they may still receive a discharge if "such act or failure to act was justified under all of the circumstances of the case."[87] As set forth above, the Plaintiffs have met their burden in establishing that the Debtor failed to keep or preserve adequate business records, thereby making it impossible for them to ascertain the Debtor's financial condition and material business transactions. The burden thus shifts to the Debtor to justify his failure to keep and preserve records,[88] and it is a fact specific inquiry:

> Justification depends on what a "reasonable person would do under similar circumstances." Relevant factors include "the education, experience, and sophistication of the debtor; the volume of the debtor's business; the complexity of the debtor's business; the amount of credit extended to the debtor in his business; and any other circumstances that should be considered in the interest of justice."[89]

Courts have found that a debtor's failure to maintain records was justified under the following circumstances: (1) the debtor's car collection was a hobby and not a for-profit business;[90] (2) the

---

[87] § 727(a)(3).

[88] *Brown*, 108 F.3d at 1295.

[89] *Steffensen*, 567 B.R. at 200 (quoting *Meridian Bank v. Alten*, 958 F.2d 1226, 1231 (3d Cir. 1992)).

[90] *Brown*, 108 F.3d at 1296.

debtor reasonably relied on her spouse to keep and maintain records;[91] and (3) the debtor was the

victim of domestic abuse that caused "her to lose control over her financial circumstances,

including her ability to retain financial records."[92] None of these fact patterns are similar to the

Debtor's situation.

Circumstances that did not justify a failure to keep or preserve business records include:

(1) the debtor was too busy to maintain records; (2) the debtor felt his records were adequate for

his purposes; (3) the debtor was unable to afford an accountant;[93] (4) the debtor was not a

sophisticated businessperson;[94] and (5) the debtor dealt almost exclusively in cash because he

disliked banks.[95]

These circumstances are more closely aligned with the facts of this case. The Debtor had

35 years of experience in his extensive and high-end vehicle restoration business, which had

employees and generated significant revenue. Thus, the Debtor was neither unsophisticated nor

inexperienced in the accounting requirements of his business. Indeed, the Debtor had an

accountant from 2014 to 2022, who prepared the Debtor's last-filed tax return for 2019.

However, when his accountant left, the Debtor chose not to replace him. Instead, he switched to

keeping records using paper and a calculator and maintaining separate paper folders for each

client rather than keeping records for the businesses as a whole.[96] Moreover, the Debtor did not

even produce these records in his bankruptcy case. Further, the Debtor did not use any

---

[91] *Lansdowne v. Cox (In re Cox)*, 41 F.3d 1294, 1299 (9th Cir. 1994).

[92] *Pereira v. Young (In re Young)*, 346 B.R. 597, 614 (Bankr. E.D.N.Y. 2006).

[93] *Steffensen*, 567 B.R. at 201.

[94] *Desiderio v. Devani (In re Devani)*, 535 B.R. 26, 34 (Bankr. E.D.N.Y. 2015)

[95] *In re Horton*, 621 F.2d 968, 971 (9th Cir. 1980).

[96] ECF No. 23-9, Transcript of Debtor's 2004 Exam, at 15:6-23.

accounting software to keep or preserve standard business records,[97] including income, expenses, and loans and repayments with the Short-Term Lenders.[98] The Court cannot see a reason why the Debtor or an employee could not have recorded business transactions in accounting software, or even an electronic spreadsheet, to maintain contemporaneous business records as to his many customers and his numerous, and often substantial, debits, credits, and transfers among his various bank accounts.

Therefore, given the length and scope of the Debtor's business enterprises, the Court finds that the Debtor's lack of an accountant, his preference to use cash, and his maintenance of separate client folders using pencil and paper —which he did not produce—does not justify his failure to keep and preserve adequate business records under § 727(a)(3).

### F. The Debtor's Assertion at the Hearing that He Has Boxes of Documents with Sufficient Records Is Too Little, Too Late.

In the Debtor's response to the U.S. Trustee's motion for summary judgment, the Debtor for the first time asserted: "I do have files for clients and billing, they are paper and not on a spread sheet, they are still in the storage unit in boxes with the other LLC assets. So yes I did keep record to the best of my ability."[99] At the hearing on the motion for summary judgment, the Debtor explained that these files were held in twelve to fifteen boxes in his storage unit, and that they would consist of the bank statements and receipts of purchases that would show where the money had been spent and paid to vendors, employees, taxing authorities, attorneys, etc.

First, the Debtor had a duty to have produced these alleged documents in connection with the U.S. Trustee's subpoena or in the initial disclosures in these adversary proceedings. Further,

---

[97] Answer, ¶ 47.

[98] ECF No. 23-9, Transcript of Debtor's 2004 Exam, at 109:6-10.

[99] ECF No. 25, at 3.

at his 2004 Exam, the Debtor was asked multiple times about his business records, and he

insisted they only consisted of the bank statements and tax return. Revealing additional

documents for the first time in response to the motions for summary judgment smacks of a sham

effort to create a disputed issue of fact. In determining whether to disregard this disclosure under

the "sham affidavit doctrine," the Court considers (1) whether the Debtor was questioned about

the existence of such business records through the subpoena duces tecum and his testimony at the

2004 exam; (2) whether the Debtor was aware of the boxes of business records at the time of his

testimony and responses to document requests; and (3) whether the Debtor's earlier testimony

was confused and he is now trying to explain it.[100]

As set forth in the undisputed facts, the Debtor was adamant, both in his testimony and

his documents production, that his only business records were the bank statements and the 2019

tax return. The Debtor also stated at the hearing that he was aware of these boxes during the

bankruptcy case, and he did not assert that his failure to disclose these documents was due to

confusion. Accordingly, under the sham affidavit doctrine, the Court finds it appropriate to

disregard the Debtor's statements about these boxes of business records, and thus, they do not

create a disputed issue of material fact that precludes summary judgment.

Second, even if the Court were to consider the existence of these records, it is not

incumbent upon the Plaintiffs to conduct a forensic audit of the Debtor's boxes of documents.[101]

Nor is the Court required to comb through documents in unknown states of organization and

piece them together to ascertain a debtor's financial condition.[102] "[A] debtor cannot simply

---

[100] *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 973 (10th Cir. 2001) (discussing the "sham affidavit doctrine.").

[101] *Lashinsky v. Medina (In re Medina)*, 653 B.R. 669 (Bankr. N.D. Okla. 2023) (U.S. Trustee was not required to conduct a forensic audit of twelve boxes of documents produced by the debtor regarding his auto and RV business).

[102] *Steffensen*, 534 B.R. at 202-03.

place sacks of records before the bankruptcy judge or trustee and request the judge or trustee to

sift through the documents and attempt to reconstruct the flow of the debtor's assets. . . . The

debtor bears the burden of retaining comprehensible records."[103] Simply put, the "Code requires

more from a debtor than the proverbial document dump. The debtor should provide *organized*

records of his financial affairs and business dealings."[104]

The Debtor's argument regarding the boxes of documents is not unlike that made by the

debtor in *Steffensen*. There, in response to the chapter 7 trustee's motion for partial summary

judgment on a § 727(a)(3) claim, the debtor contended that, despite the lack of traditional

accounting documents for his businesses, his financial condition could nevertheless be

determined from "boxes and boxes" of documents, including bills, deposit slips, canceled checks,

bank statements, and tax return work papers.[105] The court found that contention unpersuasive,

concluding that "a trustee, creditor, or court is not required to assemble discrete portions of a

debtor's records as if they were pieces of a puzzle."[106]

The Court agrees with the rationale in *Steffensen*. It is not enough to satisfy a debtor's

obligation under § 727(a)(3)—nor is it enough to even create a genuine dispute of material fact

regarding that obligation—to point to boxes of documents and assert that they contain the

required records. A debtor must take the additional step of producing relevant documents in an

organized, comprehensible format. The Debtor has not done that. Therefore, the dozen boxes of

documents offer no basis to deny the Plaintiffs' motions for summary judgment.

---

[103] *Krohn v. Frommann (In re Frommann)*, 153 B.R. 113, 118 (Bankr. E.D.N.Y. 1993) (citations omitted).

[104] *Daniels*, 641 B.R. at 187 (citations omitted).

[105] *Steffensen*, 534 B.R. at 202.

[106] *Id.* at 203 (citing

## V.   <u>CONCLUSION</u>

Through undisputed facts, the Plaintiffs have established by a preponderance of the evidence that given the size, scope, and history of the Debtor's business enterprises, he has failed to keep and preserve adequate business records. They have further established that the Debtor's limited production of business records in the form of bank statements and a tax return makes it impossible for them to ascertain the Debtor's financial condition and material business transactions. In response, the Debtor has not carried his burden to establish that his failure to keep and preserve adequate business records was justified under the circumstances of his case. Because the Court has determined that there are no genuine disputes of material fact on these issues, the Court concludes that the Plaintiffs are entitled to judgment as a matter of law and therefore grants Plaintiffs summary judgment on their causes of action under § 727(a)(3). The Debtor's discharge in his Chapter 7 case will be denied in accordance with an order and judgment to be entered concurrently with this Memorandum Decision.

**_____ooo0ooo_____**

## DESIGNATION OF PARTIES TO RECEIVE NOTICE

Service of the foregoing **MEMORANDUM DECISION ON MOTIONS FOR SUMMARY JUDGMENT** shall be served to the parties and in the manner designated below.

**By Electronic Service:** I certify that the parties of record in this case as identified below, are registered CM/ECF users:

- Zachary T. Shields    zshields@strongandhanni.com
- United States Trustee    USTPRegion19.SK.ECF@usdoj.gov
- Melinda Willden tr    melinda.willden@usdoj.gov,
  James.Gee@usdoj.gov;Lindsey.Huston@usdoj.gov;Rinehart.Peshell@usdoj.gov;
  Rachelle.D.Hughes@usdoj.gov;Brittany.Dewitt@usdoj.gov

**By U.S. Mail:** In addition to the parties of record receiving notice through the CM/ECF system, the following parties should be served notice pursuant to Fed. R. Civ. P. 5(b).

Mathew Gene Fhuere
7705 N Riverwood Way
Eagle Mountain, UT 84005